# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUIS KENNEDY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PETRÓLEO BRASILEIRO S.A. - PETROBRAS<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |



15 CV 00093

Plaintiff ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Petróleo Brasileiro S.A. - Petrobras ("Petrobras" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Petrobras; and (c) review of other publicly available information concerning Petrobras.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of all persons or entities who purchased or otherwise acquired Petrobras American Depositary Shares ("ADSs") between January 7, 2010 and November 26, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Petrobras is an integrated oil and gas company that is involved in the exploration, development, production, refining, marketing, transportation, and distribution of oil and gas products. The Company's operations account for the majority of Brazil's oil and gas production and it also operates in 17 other countries.

3.     On March 31, 2014, an article was published on the website *Offshore Energy Today* stating that Petrobras had completed an internal investigation related to alleged bribery payments to Company employees by Netherlands-based SBM Offshore ("SBM"), a Dutch provider of floating production units. Petrobras announced that the Internal Commission of Inquiry it had formed on February 13, 2014 concluded that it had not found any facts or documents evidencing payment of bribes to Petrobras employees.

4.  On September 7, 2014, after the market closed, *The New York Times* published an article about details of a widespread kickback scheme involving Petrobras and Brazilian political figures, including three governors, the energy minister and more than 30 legislators. According to the article, the confidential testimony of Paulo Roberto Costa ("Costa"), a former Petrobras executive who oversaw refining operations until 2012 was provided as part of a plea deal. According to Costa, the kickback scheme involved the billing of contracts for oil projects, and the politicians benefited by receiving three percent of the value of the contract

5.  On this news, shares of Petrobras ADSs declined $1.03 per share, over 5%, to close on September 8, 2014, at $18.35 per share, on unusually heavy volume.

6.  Following this news, Petrobras ADS prices continued to decline as more revelations about the Company's involvement in the kickback scheme and bribery came to light.

7.  On November 14, 2014, various news media reported that Brazilian police had carried out a series of raids and arrested 18 people related to the Petrobras investigation, including Renato Duque, ("Duque") former Petrobras Director of Services.  The investigation, referred to as "Operation Car Wash," and was first launched in March 2014.  Police said 11 searches took place in major Brazilian companies, including some leading construction firms. According to the police, about 10 billion reais ($3.84 billion) was skimmed off contracts in the scheme.

8.  On this news, shares of Petrobras ADSs declined $0.25 per share, nearly 2.5%, to close on November 14, 2014, at $9.95 per share, on unusually heavy volume.

9.  On November 17, 2014, the Company's Chief Executive Officer ("CEO") Maria das Graças Silva Foster ("Foster") made a statement confirming that Netherlands-based SBM

Offshore ("SBM"), a contractor in oil platform lease services, had bribed Petrobras employees to win contracts.

10.     According to an article published on November 18, 2014, Foster admitted she had found compelling evidence of bribery as a result of the internal investigations back when concerns first arose about the Company's compliance, even though at the time the Company claimed it found no evidence of violations.  According to the article, Foster "received a call and a letter where SBM said it had been told of credits to accounts in Switzerland by Public Prosecution in the Netherlands."  Additionally, the article stated that police questioned one of the contractors allegedly earmarked to win bids with the state-run oil company and he admitted to paying between $19 million and $23 million in bribes to Renato Duque, former Petrobras Director of Services, as part of the kickback scheme.

11.     On November 24, 2014, after the market closed, the Company announced that it had received a subpoena from the SEC on November 21, 2014 requesting documents for an investigation of Petrobras.

12.     On this news, shares of Petrobras ADSs declined $0.11 per share, over 1%, to close on November 25, 2014, at $10.39 per share, on unusually heavy volume.

13.     On November 26, 2014, towards the end of the trading day, an article was published in *Bloomberg* stating that the Company's auditors was waiting for results of internal corruption probes before deciding whether to approve the Company's quarterly financial results. As a result, the auditors might not sign off before June 2015.

14.     On November 27, 2014, an article was published in *Bloomberg Businessweek* stating that the Company's internal investigation into its Pasadena, Texas refinery recommended

penalties for a group of employees.  Brazil's audit court, known as TCU, has said it found $792 million in overbilling at the Pasadena refinery.

15.   U.S. stock markets were closed on November 27, 2014.  On these news, shares of Petrobras ADSs declined $0.88 per share, over 8%, to close on November 28, 2014, at $9.72 per share, on unusually heavy volume.

16.   Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company was overpricing certain contracts relating to its refineries and operations and accepting kickbacks from some companies approved for those contracts; (2) that, as a result, the Company was overcharging its property, plant, and equipment assets on its balance sheet; (3) that the Company's directors and employees accepted bribes from third-party contractors to win contracts with Petrobras; (4) that the Company lacked adequate internal controls; and (5) that, as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis.

17.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

20.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, the Company maintains an office in this Judicial District.

21.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

22.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Petrobras ADSs during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.     Defendant Petrobras is a Brazil corporation with its principal executive offices located at Avenida República do Chile, 65, 20031-912, Rio de Janeiro – RJ, Brazil.  Petrobras has an office located at 570 Lexington Avenue, 43rd floor, New York, New York 10022-6837.  Petrobras America Inc. has an office located at 10350 Richmond Avenue, Suite 1400, Houston, Texas 77042.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Petrobras is an integrated oil and gas company that is involved in the exploration, development, production, refining, marketing, transportation, and distribution of oil and gas products. The Company's operations account for the majority of Brazil's oil and gas production and it also operates in 17 other countries.

### Materially False and Misleading
### Statements Issued During the Class Period

25.     On May 22, 2009, the Company filed its Annual Report with the SEC on Form 20-F for the 2008 fiscal year. The Company's Form 20-F was signed by then CEO José Sergio Gabrielli de Azevedo ("Azevedo ") and Chief Financial Officer "CFO" Almir Guilherme Barbassa ("Barbassa").

26.     With respect to the Company's property, plant and equipment assets, the Form 20-F listed the balance as of December 31, 2009 as $84.28 billion and, in relevant part, stated:

> The costs incurred in connection with the exploration, development and production of oil and gas are recorded in accordance with the "successful efforts" method. This method requires that costs the Company incurs in connection with the drilling of developmental wells and facilities in proved reserve production areas and successful exploratory wells be capitalized. [...]

27.     With respect to internal controls, the Company's Form 20-F, in relevant part, stated:

> The management of each Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2008, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting.

28.     With respect to corporate ethics, the Company's Form 20-F, in relevant part, stated:

We have adopted a Code of Ethics applicable to our employees and executive officers and a Code of Good Practices applicable to our directors and executive officers, both of which are also applicable to PifCo. In 2006, we revised and updated our Code of Ethics. No waivers of the provisions of the Code of Ethics or Code of Good Practices are permitted. Both documents are available on our website: www.petrobras.com.br /investor relations/corporate governance. In 2008, Petrobras' board of directors created an Ethics Commission to promote ethical behavior and act as a forum for discussion of subjects related to ethics.

29.     The Company's Form 20-F also contained required Sarbanes-Oxley certifications,

signed by Azevedo and Barbassa, who certified:

1.     I have reviewed this annual report on Form 20-F of Petróleo Brasileiro S.A. – PETROBRAS (the "Company");

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.     The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.     The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

30.     On May 20, 2010, the Company filed its Annual Report with the SEC on Form 20-F for the 2009 fiscal year. The Company's Form 20-F was signed by then CEO José Sergio Gabrielli de Azevedo and then CFO Almir Guilherme Barbassa. The Company's Form 20-F also contained Sarbanes-Oxley required certifications, signed by Azevedo and Barbassa, substantially similar to the certifications contained in ¶29, *supra*.

31.     With respect to the Company's property, plant and equipment assets, the Form 20-F listed the balance as of December 31, 2009 as $136.2 billion and, in relevant part, stated:

The costs incurred in connection with the exploration, development and production of oil and gas are recorded in accordance with the "successful efforts" method. This method requires that costs the Company incurs in connection with the drilling of developmental wells and facilities in proved reserve production areas and successful exploratory wells be capitalized. […]

32.     With respect to internal controls, the Company's Form 20-F, in relevant part, stated:

> The management of each Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2009, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting.

33.     With respect to corporate ethics, the Company's Form 20-F, in relevant part, stated:

> We have always guided our business and our relations with third parties by strong ethical principles. In 1998, our board of executive officers approved the Petrobras Code of Ethics, which was extended to all Petrobras companies in 2002. In 2008, our board of executive officers further developed our ethics management through the creation of the Petrobras Ethics Commission. The Code of Ethics is applicable to all employees, the board of executive officers and the board of directors. The document is available on our website at http://www.petrobras.com.br/en/ investors/. It is the responsibility of the Ethics Commission to promote compliance with ethical principles and act as a forum for discussion of subjects related to ethics. Currently, the Commission's focus is to develop and strengthen the Petrobras Ethics Management System, which is aimed at assuring the highest ethics standards by defining the roles of managers, employees, the Ethics Commission and their relationships.

34.     On May 26, 2011, the Company filed its Annual Report with the SEC on Form 20-F for the 2010 fiscal year.  The Company's Form 20-F was signed by then CEO Azevedo and then CFO Barbassa.   The Company's Form 20-F also contained Sarbanes-Oxley required certifications, signed by Azevedo and Barbassa, substantially similar to the certifications contained in ¶29, *supra*.

35.     With respect to the Company's property, plant and equipment assets, the 2010 Form 20-F listed the balance as of December 31, 2010 as $218.6 billion and, in relevant part, stated:

> The costs incurred in connection with the exploration, development and production of oil and gas are recorded in accordance with the "successful efforts"

method. This method requires that costs the Company incurs in connection with the drilling of developmental wells and facilities in proved reserve production areas and successful exploratory wells be capitalized. [...]

36.     With respect to internal controls, the Company's 2010 Form 20-F, in relevant part, stated:

> The management of each Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2010, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting.

37.     With respect to corporate ethics, the Company's 2010 Form 20-F, in relevant part, stated:

> We have always guided our business and our relations with third parties by strong ethical principles. In 1998, our board of executive officers approved the Petrobras Code of Ethics, which was extended to all Petrobras companies in 2002, and renamed Petrobras System's Code of Ethics.
>
> In 2006, after undergoing a revision process with wide participation from our business segments, employees and subsidiaries, the Code of Ethics was approved by the board of executive officers and the board of directors. Our board of executive officers further developed our ethics management through the creation of the Petrobras Ethics Commission in 2008. The Code of Ethics is applicable to all employees and the members of the board of executive officers and the board of directors. The document is available on our website at http://www.petrobras.com. br/en/investors. It is the responsibility of the Ethics Commission to promote compliance with ethical principles and act as a forum for discussion of subjects related to ethics. Currently, the Commission's focus is to develop and strengthen the Petrobras Ethics Management System, which is aimed at assuring the highest ethics standards by defining the roles of managers, employees, the Ethics Commission and their relationships.

38.     On April 2, 2012, the Company filed its Annual Report with the SEC on Form 20-F for the 2011 fiscal year. The Company's Form 20-F was signed by CEO Maria das Graças Silva Foster and then CFO Barbassa. The Company's Form 20-F also contained Sarbanes-Oxley required certifications, signed by Foster and Barbassa, substantially similar to the certifications contained in ¶29, *supra*.

39.     With respect to the Company's property, plant and equipment assets, the 2011 Form 20-F listed the balance as of December 31, 2011 as $182.5 billion and, in relevant part, stated:

> The costs incurred in connection with the exploration, development and production of oil and gas are accounted for in accordance with the successful efforts method. This method requires that capitalization of costs incurred in connection with the development of proved reserve areas and successful exploratory wells. […]

40.     With respect to internal controls, the Company's 2011 Form 20-F, in relevant part, stated:

> The management of each Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2011, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting.

41.     With respect to corporate ethics, the Company's 2011 Form 20-F, in relevant part, stated:

> We guide our business and our relations with third parties by ethical principles. In 1998, our board of executive officers approved the Petrobras Code of Ethics, which was extended to all Petrobras companies in 2002, and renamed Petrobras System's Code of Ethics.
>
> In 2006, after undergoing a revision process with wide participation from our business segments, employees and subsidiaries, the Code of Ethics was approved by the board of executive officers and the board of directors. Our board of executive officers further developed our ethics management through the creation of the Petrobras Ethics Commission in 2008. The Code of Ethics is applicable to all employees and the members of the board of executive officers and the board of directors. The document is available on our website at http://www.petrobras.com. br/en/investors. It is the responsibility of the Ethics Commission to promote compliance with ethical principles and act as a forum for discussion of subjects related to ethics.

42.     On April 29, 2013, the Company filed its Annual Report with the SEC on Form 20-F for the 2012 fiscal year. The Company's Form 20-F was signed by CEO Foster and then CFO Barbassa.     The Company's Form 20-F also contained Sarbanes-Oxley required

certifications, signed by Foster and Barbassa, substantially similar to the certifications contained in ¶29, *supra.*

43.     With respect to the Company's property, plant and equipment assets, the 2012 Form 20-F listed the balance as of December 31, 2012 as $204.9 billion and, in relevant part, stated:

> Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

44.     Additionally, the 2012 Form 20-F in relevant part, stated:

> The costs incurred in connection with the exploration, appraisal, development and production of oil and gas are accounted for using the successful efforts method of accounting,

45.     With respect to internal controls, the Company's 2012 Form 20-F, in relevant part, stated:

> Our management has not identified any changes in its internal control over financial reporting during the fiscal year ended December 31, 2012, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting.

46.     With respect to corporate ethics, the Company's 2012 Form 20-F, in relevant part, stated:

> We guide our business and our relations with third parties by ethical principles. In 1998, our board of executive officers approved the Petrobras Code of Ethics, which was extended to all Petrobras subsidiaries, and which was renamed to Petrobras System Code of Ethics in 2002.
>
> In 2006, after undergoing a revision process with wide participation from our business segments, employees and subsidiaries, the current version of the Code of Ethics was approved by the board of executive officers and the board of directors. The Code of Ethics is applicable to all employees, executive officers and the

board of directors.   It is available on our website at http://www.petrobras .com.br/en/investors.

Our executive officers further developed our ethics management through the creation of the Petrobras Ethics Commission in 2008 which since then, has become responsible for promoting corporate compliance with ethical principles, as well as acting as a forum for discussion of subjects related to ethics.

47.     On March 31, 2014, an article was published on the website *Offshore Energy Today* entitled, "Petrobras: No evidence of bribery in SBM Offshore investigation." The article, in relevant part, stated:

> Brazilian state-run oil company Petrobras has completed an investigation into an alleged bribery case involving SBM Offshore and its employees. No evidence of wrongdoing has been found.
>
> Petrobras has announced that the Internal Commission of Inquiry, formed on Feb. 13, 2014 to investigate alleged bribe payments to Company employees involving SMB Offshore, a Dutch provider of floating production units, concluded that, based on the work done and restricted to its regulatory competence, it found no facts or documents evidencing payment of bribes to Petrobras employees.
>
> Also, during the work done by the mentioned Internal Commission, explanations were provided to the Comptroller General's Office and to the Federal Prosecutor's Office.
>
> The final Report of Petrobras' Internal Commission of Inquiry will be forwarded to the Comptroller General's Office, to the Federal Budget Oversight Board, and to the Federal Prosecutor's Office.
>
> According to allegations, SBM Offshore paid more than a $100 million in bribes to secure FPSO contracts.
>
> *"We are pleased to note the conclusion of Petrobras' investigation. The Company hopes to be able to share more details on its internal investigation in the next few days," SBM Offshore said in a statement.*

48.     On April 16, 2014, an article was published in the Brazilian newspaper *Folha de S. Paulo*. The article, in relevant part, stated:

> In a six-hour testimony yesterday at the Senate, Petrobras CEO, Graça Foster, admitted that the purchase of the Pasadena refinery (from the United States), in

2006, "was not a good deal," but she endorsed President Dilma Rousseff's version by stating that the summary in which the acquisition was based was incomplete.

According to Foster, the Pasadena refinery caused losses of US$530 million to the state company and only started to become profitable this year, accounting for []US$58 million in the first two months.

"It was not a good deal. This is unquestionable from an accounting perspective. It is a project with low probability for recovering the results," she said.

*     *     *

The CEO of the state company also acknowledged that the arrest of the former director Paulo Roberto Costa caused "great embarrassment".

Costa is one of the targets of Operation Lava Jato, that is investigating a money laundering and transfer scheme from contractors and suppliers from Petrobras to political parties.

49.     On April 30, 2014, the Company filed its Annual Report with the SEC on Form 20-F for the 2013 fiscal year.  The Company's Form 20-F was signed by CEO Foster and then CFO Barbassa.    The Company's Form 20-F also contained Sarbanes-Oxley required certifications, signed by Foster and Barbassa, substantially similar to the certifications contained in ¶29, *supra*.

50.     With respect to the Company's property, plant and equipment assets, the 2013 Form 20-F listed the balance as of December 31, 2013 as $227.9 billion and, in relevant part, stated:

The costs incurred in connection with the exploration, appraisal, development and production of oil and gas are accounted for using the successful efforts method of accounting.

51.     Additionally, the 2013 Form 20-F in relevant part, stated:

In 2013, we invested a total of U.S.$3,162 million in our refineries, of which U.S.$2,512 million was invested in hydrotreating units necessary to improve the quality of our diesel oil and gasoline and U.S.$174 million in coking units necessary to convert heavy oil into lighter products.

52.     With respect to internal commissions, the Company's 2013 Form 20-F, in relevant part, stated:

> On March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations.
>
> We currently have a number of internal commissions in place that were set up in certain instances to evaluate past transactions mentioned in public press reports, including: (i) a commission formed on March 24, 2014 to evaluate aspects of the Pasadena refinery acquisition; (ii) a commission formed on April 11, 2014 to evaluate our contracts with our service provider EcoGlobal; (iii) a commission formed on April 14, 2014 to evaluate our contracts with our service provider Astro Marítima Navegação S.A.; and (iv) two commissions formed on April 25, 2014 to evaluate our contracts with service providers involved in our refining projects Refinaria Abreu e Lima (RNEST) and COMPERJ. Each of these internal commissions has between 30 and 60 days to complete its work. Based on the information that is currently available, we do not believe that the findings of any of these internal commissions would have a material effect on our financial statements.

53.     With respect to corporate ethics, the Company's 2013 Form 20-F, in relevant part, stated:

> We guide our business and our relations with third parties by ethical principles. In 1998, our board of executive officers approved the Petrobras Code of Ethics, which was extended to all Petrobras subsidiaries, and which was renamed to Petrobras System Code of Ethics in 2002.
>
> In 2006, after undergoing a revision process with wide participation from our business segments, employees and subsidiaries, the current version of the Code of Ethics was approved by the board of executive officers and the board of directors. The Code of Ethics is applicable to our workforce, executive officers and the board of directors.     It is available on our website at http://www. investidorpetrobras.com.br/en/governance/code-of-ethics/.
>
> Our executive officers further developed our ethics management through the creation of the Petrobras Ethics Commission in 2008 which since then, has become responsible for promoting corporate compliance with ethical principles, as well as acting as a forum for discussion of subjects related to ethics.

54.     The statements contained in ¶¶25-53 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company

was overpricing certain contracts relating to its refineries and operations and accepting kickbacks from some companies approved for those contracts; (2) that, as a result, the Company was overcharging its property, plant, and equipment assets on its balance sheet; (3) that the Company's directors and employees accepted bribes from third-party contractors to win contracts with Petrobras; (4) that the Company lacked adequate internal controls; and (5) that, as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis.

### The Truth Slowly Emerges

55.    On September 7, 2014, after the market closed, *The New York Times* published an article on its website entitled, "Oil Scandal Erupts Again as Brazilians Near Election." Therein, the article, in relevant part, stated:

> As Brazilians prepare to vote in a national election next month, a scandal involving the state-controlled oil giant Petrobras flared up again this weekend over testimony that implicated dozens of top figures in President Dilma Rousseff's governing coalition in a vast kickback scheme.

> Details of the scheme were revealed in confidential testimony by Paulo Roberto Costa, a jailed former executive who oversaw refining operations at Petrobras until 2012. The testimony was obtained by Veja, a Brazilian magazine. The accusations target Ms. Rousseff's energy minister, Edison Lobão, and the leaders of both houses of Congress, Henrique Eduardo Alves and Renan Calheiros.

> The revelations complicate a tough re-election bid by Ms. Rousseff, who has seen her lead in the polls vanish amid the surging candidacy of Marina Silva, an environmental leader whose campaign has blasted Ms. Rousseff over corruption at Petrobras and called on Brazil to shift toward a greater reliance on renewable energy sources. The election is scheduled for Oct. 5.

> "Petrobras was already a minefield for Dilma's image as a manager," said Eliane Cantanhêde, a columnist at the newspaper Folha de S. Paulo, emphasizing that the report raised further doubts about the ethics of the governing Workers Party after the convictions of top figures in the party for their roles in a separate scandal over a sprawling vote-buying scheme.

Ms. Rousseff addressed the revelations on Saturday at a campaign stop in São Paulo, saying that she was awaiting official information on the matter in order to take "all of the appropriate measures." She added that it was too early to act on the "basis of speculation." No charges have been filed against any of the political figures mentioned by Mr. Costa, the former Petrobras executive, and those he named rushed to say that they were innocent.

Mr. Costa was arrested in March after investigators said they had discovered a money-laundering operation that he had helped oversee as one of the most powerful executives at Petrobras from 2004 to 2012. Brazilian prosecutors said they discovered that Mr. Costa had kept about $23 million in Swiss bank accounts after profiting from the scheme.

In a plea deal, he recently agreed to provide more details about the operation, which he said had involved the billing of contracts for oil projects, according to the Veja report. Political figures — including three governors, the energy minister and more than 30 legislators — then benefited by receiving 3 percent of the value of the contracts, the report said, citing his testimony.

Mr. Costa's testimony could also complicate the presidential campaign of Ms. Silva because Mr. Costa tied her former running mate, Eduardo Campos, to the scheme. Mr. Campos, the former governor of Pernambuco State, died in a plane crash in August, jolting Brazil's political establishment and opening the way for Ms. Silva to take his place as the party's presidential candidate.

Ms. Silva told reporters over the weekend that her campaign would respond to the claims by "talking to people and doing everything with a great deal of calm, because we're democrats and we believe in democracy."

56.     On this news, shares of Petrobras ADSs declined $1.03 per share, over 5%, to close on September 8, 2014, at $18.35 per share, on unusually heavy volume.

57.     On September 8, 2014, after the market closed, the Company issued a press release entitled, "Clarification on News."  Therein, the Company, in relevant part, stated:

Petrobras announces that since Friday, 09/05, media outlets have been publishing materials containing Petrobras's name based on non-official information obtained from Mr. Paulo Roberto Costa's alleged testimony to the Federal Police.

Regarding this matter, Petrobras clarifies that:

1.     It is inappropriate to comment on non-official information published by media outlets. It is also inappropriate to comment on ongoing investigations or on

the declarations of individuals or companies under investigation by the Federal Police or by any other authorities.

2.      Regarding its projects and businesses, Petrobras has continued to provide information to the public via its website www.petrobras.com.br, Press Releases, responses to media outlets and announcing any Material Facts. This ensures transparency in all matters relating to the cases that are under analysis or under investigation.

3.      Furthermore, Petrobras fully complies with its obligations and has been providing all information requested by the Federal Police – PF, Federal Audit Court – TCU, Office of the Federal Controller General – CGU and the Public Prosecutor's Office – MP. In addition, the company always notifies these entities of new facts and information that come to its attention.

4.      Petrobras's management is interested in seeing the conclusion of all ongoing investigations by all such entities. The company will continue to contribute swiftly and effectively for this to happen. In this regard, Petrobras has requested to the judge responsible for the "Lava Jato" operation to gain access to the information pertaining to Petrobras that has been provided by Mr. Paulo Roberto Costa within the scope of his whistleblower status. In addition, the company has sent letters to the companies cited by the media outlets requesting information regarding the existence of its contracts with the companies connected to Mr. Alberto Youssef and on any involvement with the activities object of this investigation. This information will aid the work of the Internal Investigative Commissions that have been set-up.

5.      Lastly, the Executive Board announces to its shareholders and employees that the company continues to operate normally across all of its units to meet its business objectives. The illegal activities, which may have been committed by an individual or by a group of individuals, employed or not by the company, do not represent the conduct of the Petrobras institution or of its workforce consisting of thousands of employees.

58.      On this news, shares of Petrobras ADSs declined $0.52 per share, nearly 3%, to close on September 9, 2014, at $17.83 per share, on unusually heavy volume.

59.      On October 1, 2014, various Brazilian news outlets reported on October 1, 2014, that Renato Duque, the Company's former director of engineering and services, had signed contracts that could link him to the scandal. *Bloomberg* also published an article on its website

entitled, "Probed Petrobras Contracts Show Duque Also Signed Deals." Therein, the article, in

relevant part, stated:

> Petroleo Brasileiro SA (PETR4) contracts at the center of a criminal investigation that has former executive Paulo Roberto Costa awaiting trial show that another top manager had negotiated and recommended board approval of the allegedly over-billed deals.
>
> Renato Duque, a former director of engineering and services at the state-run crude producer, stamped and signed at least 6.6 billion reais ($2.7 billion) in contracts for the Abreu e Lima refinery in northeastern Brazil, according to internal Petrobras documents obtained by Bloomberg.
>
> Prosecutors have identified evidence of fraud, overpricing and kickbacks in the same contracts and used them to recommend criminal action against Costa, the former head of refining. As head of engineering, it was part of Duque's job to work closely with the refining unit. Efforts to reach Duque by phone and a written message to him delivered to his assistant weren't answered.
>
> Costa, as part of a request from prosecutors to have him released from jail and await trial under house arrest, agreed to turn over assets including $25.8 million held in accounts in Switzerland and the Cayman Islands to the Brazilian government, which controls Petrobras with a majority of voting shares. "He recognizes they are all, entirely, product of criminal activity," prosecutors said of the assets in the request, which was also signed by Costa and his lawyer.
>
> *       *       *
>
> Prosecutors cited seven contracts suspected of fraud and overpricing in their recommendation for criminal action against Costa, including one for a 3.4 billion-real coking unit and another for a 3.19 billion-real hydro-treater and related units, key equipment for converting crude oil into transportation fuels. The Petrobras documents obtained by Bloomberg show Duque stamped, signed and sent the two contracts for approval from Petrobras' executive board in late 2009.
>
> The prosecutors cite evidence of overpricing and overbilling of as much as 446 million reais in the coking unit contract. The two contracts were also targeted by the Accounts Tribunal, a federal watchdog overseeing public spending, in a 2010 investigation. The TCU, as it's known, found 1.3 billion reais of overpricing in Abreu e Lima contracts.

60.    On this news, shares of Petrobras ADSs declined $0.89 per share, over 6%, to

close on October 1, 2014, at $13.30 per share, on unusually heavy volume.

61.    On October 9, 2014, after the market closed, the court released Costa's testimony

online.  An article was published in *The Wall Street Journal* entitled, "Ex-Petrobras Executive

Says Kickbacks Were Paid to Ruling Party's Officials."  Therein, the article, in relevant part,

stated:

> A former executive of state-run oil company Petroleo Brasileiro SA has testified
> in a Brazilian federal court that kickbacks were paid to members of the ruling
> Workers' Party, a claim that could have implications for the nation's presidential
> elections later this month.
>
> The testimony, recordings of which were released online by the court Thursday,
> contains the latest in a string of corruption allegations involving Petrobras, and
> could provide ammunition to challenger Aécio Neves, who is locked in a tight
> race with incumbent Dilma Rousseff.
>
> The former Petrobras executive, Paulo Roberto Costa, who was arrested earlier
> this year on money laundering charges and is currently under house arrest, alleged
> on the recordings that kickbacks to members of Ms. Rousseff's Workers' Party, or
> PT, were commonplace in his and other divisions of Petrobras.
>
> Mr. Costa, who testified as part of a plea deal with investigators to reduce his
> sentence and who admits to taking bribes himself, alleged that a certain
> percentage of contracts at the refining unit of Petrobras were to go to members of
> the Workers Party. Mr. Costa was Petrobras's supply and refining director until
> 2012.
>
> Rui Falcão, the PT national president, said in a statement Thursday that the party
> "vehemently repudiates" the "slanderous" allegations, and that all donations to the
> PT follow legal standards.
>
> In the audio tapes, made available by the federal court in the state of Paraná, Mr.
> Costa also alleges kickbacks took place for contracts at Transpetro, a subsidiary
> of Petrobras.
>
> A spokesperson for Transpetro said the president of the company, Sergio
> Machado, who is named in the tapes, "vehemently denies the claims" and that the
> charges are "untrue and absurd."
>
> Petrobras said in a statement that it is cooperating with investigators.
>
> "Petrobras would also like to emphasize that the company is considered by those
> authorities to be the victim in this investigation process," it said.

An attorney for Mr. Costa couldn't immediately be reached.

Mr. Costa's allegations are the latest among several corruption scandals tied to Petrobras, the biggest oil company in Latin America. The scandals have become part of the re-election campaign of Ms. Rousseff, who faces a runoff election October 26. The incumbent has been forced to address concerns about Petrobras regularly at campaign stops, while Mr. Neves, her challenger, has regularly cited the alleged corruption at Petrobras as something he would address if elected.

Still, the latest allegations are unlikely to threaten her standing as the favorite to win the election.

Petrobras is also the subject of two congressional inquiries, convened to investigate the 2006 purchase of a Texas refinery.

62.     On this news, shares of Petrobras ADSs declined $1.15 per share, nearly 7%, to close on October 10, 2014, at $15.62 per share, on unusually heavy volume.

63.     On October 16, 2014, an article was published in *Bloomberg* entitled, "Petrobras Petrobras Refinery Is 60% Over Budget, Audit Court Says." Therein, the article, in relevant part, stated:

Petroleo Brasileiro SA (PBR), the state-run producer being probed for cost overruns, is set to spend 60 percent more than budgeted at one of its refineries, according to the tribunal overseeing state spending.

Petrobras, as the Rio de Janeiro-based company is known, will pay $21.6 billion to complete the Comperj complex that's scheduled to open in 2016, Jose Jorge, a member of the TCU tribunal, said in documents released in Brasilia yesterday.

Jorge said there are discrepancies between different government agencies, as well as within different Petrobras divisions, over investments needed for Comperj. Management has been "reckless" with irregularities in the omission of technical analysis, overpaying for contracts and a lack of effective controls, according to the audit report. Petrobras' press department didn't immediately respond to an e-mail and phone calls seeking comment

"We're basically investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way," Jorge told reporters after the tribunal session.

He said there were irregularities in three contracts: two that were overpaid and one that was signed in an "emergency" time-frame that didn't allow other

companies to bid. Other tribunal members asked for more time to analyze the audit report and suggested issuing a warning to Petrobras to give the company time to explain the discrepancies.

64.     On this news, shares of Petrobras ADSs declined $1.05 per share, nearly 7%, to close on October 16, 2014, at $14.50 per share, on unusually heavy volume.

65.     On October 19, 2014, an article was published in *Bloomberg* entitled, "Rousseff Says Evidence Shows Petrobras Funds Diverted." Therein, the article, in relevant part, stated:

> Brazil's President Dilma Rousseff over the weekend for the first time said evidence exists that money was illegally diverted from state-controlled oil company Petroleo Brasileiro SA. (PETR4)
>
> Officials still don't know how much money was siphoned from Petrobras and who diverted the funds, Rousseff said yesterday in a televised debate, repeating what she told journalists Oct. 18 in Brasilia. She told reporters the state would seek reimbursement of any funds illegally diverted from the oil company. Petrobras's press office didn't immediately respond to an e-mail sent yesterday evening requesting a response to the allegations.

66.     On this news, shares of Petrobras ADSs declined $0.93 per share, over 6%, to close on October 20, 2014, at $14.00 per share, on unusually heavy volume.

67.     On October 21, 2014, an in-depth article was published in *Bloomberg* entitled, "Brazil Fixated as 'Human Bomb' Revelations Rock Elections." Therein, the article, in relevant part, stated:

> Costa, according to an Aug. 27 agreement made public in the Parana federal court documents, is cooperating with authorities. His cooperation has become public theater. Video tapes released by the Parana court -- which have riveted Brazilians to their TVs -- show him telling investigators that for at least seven years he and others siphoned millions in kickbacks from companies to whom Petrobras awarded inflated construction contracts. They then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves, according to the tapes.
>
> Speaking into a camera, Costa described the kickbacks from the companies as a "three percent political adjustment" and said he personally raked-off tens of millions of dollars, according to the tapes.

\*　　　\*　　　\*

Those Parana state federal court documents show that in their decision to prosecute Costa investigators pointed to seven Petrobras contracts, including one for a coking unit and hydro-treater – installations vital to converting crude oil into transportation fuels -- that the documents say were over billed. A report by the Accounts Tribunal, a federal watchdog overseeing public spending, has put the total as high $540 million (1.3 billion reais.) With Costa and Duque both signing off, the contracts were sent to Petrobras' executive board in late 2009, where they were approved.

68.　　On this news, shares of Petrobras ADSs declined $0.80 per share, nearly 6%, to close on October 21, 2014, at $13.20 per share, on unusually heavy volume.

69.　　On November 1, 2014, an article was published in *Bloomberg* entitled, "Auditor refuses to sign off Brazil Petrobras' Q3 results -Estado." Therein, the article, in relevant part, stated:

Brazil's Petrobras failed to get its third-quarter earnings approved by PriceWaterhouseCoopers as the auditing firm demanded wider investigation into a corruption scandal plaguing the state-run oil company, newspaper O Estado de S.Paulo said on Saturday.

Directors of Petroleo Brasileiro SA, as the oil firm is formally known, halted a Friday board meeting before making any decisions and rescheduled it for Tuesday, a source told Reuters without providing details. A possible fuel price increase was expected to be discussed on Friday.

Estado reported that Petrobras' board, which is presided by Finance Minister Guido Mantega, spent the meeting discussing how to handle PwC's demands for more investigation into an alleged corruption scheme uncovered by Brazil's federal police.

PriceWaterhouseCoopers, which has been auditing Petrobras' financial statements since 2012, refused to sign off on the firm's third-quarter earnings and threatened to take the case to U.S. authorities, Estado said. Petrobras' shares are listed on several different exchanges, including Sao Paulo's BM&FBovespa and the New York Stock Exchange.

23

70.     On Sunday, November 9, 2014, an article was published in *The Financial Times* entitled, "US turns up heat with criminal investigation into Petrobras." Therein, the article, in relevant part, stated:

> US authorities are investigating whether Petrobras or its employees were paid bribes, adding to the mounting domestic corruption probes facing the Brazilian state-controlled oil company, people familiar with the matter say.

> The US Department of Justice has opened a criminal investigation into the company, whose American depositary receipts trade in New York, while the Securities and Exchange Commission is pursuing a civil investigation, these people say.

71.     On this news, shares of Petrobras ADSs declined $0.28 per share, over 2.5%, to close on November 10, 2014, at $10.62 per share, on unusually heavy volume.

72.     On November 13, 2014, the Company issued a press release entitled, "Third quarter 2014 financial statements." Therein, the Company, in relevant part, stated:

> Petrobras announces that it will not file its third quarter 2014 financial statements (ITR 3Q14) accompanied by a review report of its Independent Auditors, PricewaterhouseCoopers (PwC), with the Comissão de Valores Mobiliários (Securities and Exchange Commission) of Brazil (CVM) within the period required by CVM Instruction 480/09, for the reasons stated below.

> As has become known publicly, Petrobras is undergoing a unique moment in its history, in light of the accusations and investigations of the "Lava Jato Operation" being conducted by the Brazilian Federal Police, which has led to charges of money laundering and organized crime against the company's former Downstream Director, Paulo Roberto Costa. The former director is currently under investigation for corruption and embezzlement, among other offenses.

> Faced with these circumstances, and considering the declarations of the former Downstream Director in a federal court on October 8, 2014 that, if found to be true, could potentially affect the company's financial statements, Petrobras has taken numerous steps aimed at furthering related investigations.

> Within this context, on October 24 and 25, 2014 Petrobras hired two independent law firms specialized in conducting investigations – Brazilian firm Trench, Rossi e Watanabe Advogados and U.S. firm Gibson, Dunn & Crutcher LLP – to examine the nature, extent and impact of the acts that may have been committed within the context of the allegations made by former Downstream Director Paulo

Roberto Costa, as well as to investigate related facts and circumstances that have a significant impact on the company's business operations. Hiring these independent firms was recommended by the Audit Committee of the Board of Directors in compliance with the best international practices and authorized by the Executive Board.

However, as a result of the time needed to (i) gain greater understanding from the ongoing investigations by the independent law firms (ii) make any adjustments to the financial statements based on the accusations and investigations related to the "Lava Jato Operation" and (iii) evaluate the need for internal controls improvements, Petrobras is unable to release its third quarter 2014 financial statements at this time.

As a result, and in recognition of the importance of transparency, Petrobras expects to release its third quarter 2014 financial statements, without a review by its Independent Auditors, on December 12, 2014, reflecting its balance sheet based on facts that are known as of that date.

73.     On November 14, 2014, an article was published on the *BBC News* website entitled, "Brazilian police arrest 18 in Petrobras corruption raids." Various other news media also covered the story. Therein, the article, in relevant part, stated:

Brazilian police have carried out a series of raids and arrested 18 people as part of a corruption investigation into the state-run oil firm Petrobras.

More than 300 police and 50 tax officials were involved in the operation across five states, as well as in the capital Brasilia.

Police said 11 searches took place in major Brazilian companies, including some leading construction firms.

Petrobras is also being investigated by US authorities.

The company, which is majority-owned by the Brazilian government, is one of the largest oil businesses in the world. Its reach extends far beyond South America; Petrobras has interests in Asia, Africa and the Middle East.

In the past few months, Petrobras has been rocked by corruption allegations made by a former executive Paulo Roberto Costa, who is giving evidence to police as part of a plea bargain arrangement.

Costa, who was arrested in March, has alleged that the refinery division of the company operated a fund that diverted money to political parties - including the ruling Workers' Party.

The resulting probe, codenamed Operation "Car Wash", has led to raids in Parana, Sao Paulo, Rio de Janeiro, Minas Gerais and Pernambuco, as well as Brasilia.

Brazilian police say they have blocked assets worth more than $270m (£172m), belonging to 36 of those targeted in the latest stage of the investigation.

Another former director of Petrobras is reported to be among those detained.

74.     On this news, shares of Petrobras ADSs declined $0.25 per share, nearly 2.5%, to close on November 14, 2014, at $9.95 per share, on unusually heavy volume.

75.     On November 17, 2014, the Company held a conference call with investors and discussed the possibility of taking deductions from PP&E if allegations of overpayments are confirmed.

76.     Additionally on November 17, 2014, CEO Foster made a statement confirming that SBM bribed Petrobras employees.  On November 18, 2014, an article was published on the *Agencia Brasil* website entitled, "Petrobras CEO admits SBM Offshore bribed officials." Therein, the Company, in relevant part, stated:

Graça Foster, CEO for state-run Petrobras oil company, gave a statement Monday (Nov. 17) confirming that Netherland-based SBM Offshore, a contractor in oil platform lease services, admitted to bribing Petrobras employees to win contracts. However, SBM has not given any details as to who paid the bribes and how much they offered. Foster said the Dutch company will no longer be eligible to bid for further contracts with Petrobras.

Petrobras started internal due diligence when the concerns emerged, but could not find evidence of violations on that occasion. But in a recent interview to clarify a delay in disclosing the company's financial statements, Graça Foster revealed that she had found compelling evidence of bribery as a result of the internal investigations back then.

"The CEO received a call and a letter where SBM said it had been told of credits to accounts in Switzerland by Public Prosecution in the Netherlands. This is overwhelming evidence outright – it's the company's own admission that it was aware of it [bribery]," said José Formigli, Petrobras Head of Exploration and Production.

As a result of this "overwhelming evidence of noncompliance," SBM will be barred from entering into contracts with Petrobras in spite of its "outstanding delivery performance" according to Graça Foster. "We promptly told SBM that they would be ineligible to participate in any further bidding to work for us until the people who were taking bribes were identified," she said. But she made it clear that SBM's eight existing contracts with Petrobras will not be suspended.

José Antônio de Figueiredo, Director of Engineering, Technology and Materials for Petrobras, added that once non-compliance allegations are proven, SBM may get suspended from further bidding to work for Petrobras for six months to two years. "This can occur in case of poor performance or inappropriate business conduct," he said.

One of the executives investigated by Federal Police as part of Operation Car Wash, which unveiled a kickback scheme within Petrobras, told prosecutors that there was a "club" of contractors earmarked to win bids with the state-run oil company. When questioned by police, Augusto Ribeiro de Mendonça Neto, director for Toyo Setal, said he paid between $19 million and $23 million in bribes to Renato Duque, former Petrobras Director of Services, as part of the scheme.

77.     On this news, shares of Petrobras ADSs declined $0.62 per share, over 6%, to close on November 17, 2014, at $9.33 per share, on unusually heavy volume.

78.     On November 24, 2014, the Company issued a press release entitled, "SEC Subpoena." Therein, the Company, in relevant part, stated:

Petróleo Brasileiro S.A. – Petrobras hereby informs that on November 21 it received a subpoena from the U.S. Securities and Exchange Commission ("SEC") requesting certain documents relating to the SEC's investigation of the Company.

The subpoena requires the production of certain documents that will be gathered with the assistance of Trench, Rossi e Watanabe Advogados and Gibson, Dunn & Crutcher, the Brazilian and U.S. law firms previously retained by Petrobras to conduct an independent internal investigation.

Petrobras reiterates its commitment to cooperate with the U.S. authorities with the same dedication that it has been cooperating with the authorities in Brazil.

79.     On this news, shares of Petrobras ADSs declined $0.11 per share, over 1%, to close on November 25, 2014, at $10.39 per share, on unusually heavy volume.

80.     On November 26, 2014, towards the close of the trading day, an article was published in *Bloomberg* entitled, "Petrobras Probes Said to Delay PwC Audit Until Next Year." Therein, the article, in relevant part, stated:

> Petroleo Brasileiro SA's (PBR) auditor is waiting for results of internal probes into corruption allegations before deciding whether to approve quarterly results, two people with knowledge of the matter said.
>
> Investigations by independent law firms Trench, Rossi & Watanabe and Gibson, Dunn & Crutcher LLP probably will extend into 2015 and PricewaterhouseCoopers LLP will need additional time to audit the results, the people said, asking not to be named because details of the matter are private.
>
> While the state-run oil producer says it has enough cash to cover investments for at least six months, a prolonged investigation may inhibit Petrobras' funding plans given it needs the approval of its auditor to be able to sell bonds. PwC may not sign off before June, one of the people said.
>
> "While bond markets would be shut for them without the presentation of audited results, they need to come to market to continue funding their investment plan," Carlos Gribel, head of fixed income at Andbanc Brokerage LLC in Miami, said by phone. "Until there is a final assessment of the size of the problem, the size of the hole, issuing debt is not feasible."

81.     On November 27, 2014, an article was published in *Bloomberg Businessweek* entitled, "Petrobras Texas Refinery Probe Recommends Staff Penalties." Therein, the article, in relevant part, stated:

> Petroleo Brasileiro SA's (PETR4) internal investigation into its Pasadena, Texas refinery recommends penalties for a group of employees, said a member of the company's board of directors.
>
> Reports on the Abreu e Lima and Comperj refineries, where costs exceeded the state-run oil producer's original estimates, will be presented at a Dec. 12 board meeting, Sergio Quintella, a member of the board, told reporters in Rio de Janeiro today. The company is taking the right steps by setting up a new division to oversee corporate governance, he said.
>
> "The board has already approved a report on Pasadena, a conclusive report, with a series of proposals for probes and punishments," said Quintella, who is also a vice president at the Getulio Vargas Foundation, a research institute and business university. "There is a list, they have the right to defend themselves."

Petrobras, as the most indebted publicly traded company is known, is at the center of a multibillion-dollar corruption and money laundering scandal that has resulted in the arrest of two former members of its executive board.

Paulo Roberto Costa, the company's former head of refining who is cooperating under a plea bargain deal, said he received bribes from construction companies that had been awarded overpriced contracts, mostly for work in Brazil, according to videotaped testimony made public by a federal court.

Petrobras said internal committee's report on Pasadena refinery was presented to audit committee, not to its board, the company said today in an e-mailed statement.

The Rio de Janeiro-based company paid $1.2 billion in two installments, in 2006 and in 2012, for the Pasadena refinery that Transcor Astra Group SA had bought for $42.5 million in 2005. Brazil's audit court, known as TCU, has said it found $792 million in overbilling at the Pasadena refinery.

82.    U.S. stock markets were closed on November 27, 2014. On these news, shares of Petrobras ADSs declined $0.88 per share, over 8%, to close on November 28, 2014, at $9.72 per share, on unusually heavy volume.

## **CLASS ACTION ALLEGATIONS**

83.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Petrobras's securities between January 7, 2010 and November 26, 2014, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

84.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Petrobras's securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to

Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Hundreds of thousands of Petrobras ADSs were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Petrobras or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

85.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

86.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

87.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Petrobras; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

88.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

89.     The market for Petrobras's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Petrobras's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Petrobras's securities relying upon the integrity of the market price of the Company's securities and market information relating to Petrobras, and have been damaged thereby.

90.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Petrobras's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Petrobras's business, operations, and prospects as alleged herein.

91.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Petrobras's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an

unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

92.      Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

93.      During the Class Period, Plaintiff and the Class purchased Petrobras's securities at artificially inflated prices and were damaged thereby.   The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

94.      As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Petrobras, his/her control over, and/or receipt and/or modification of Petrobras's allegedly materially misleading misstatements and/or

their associations with the Company which made them privy to confidential proprietary information concerning Petrobras, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

95.    The market for Petrobras's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Petrobras's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Petrobras's securities and market information relating to Petrobras, and have been damaged thereby.

96.    During the Class Period, the artificial inflation of Petrobras's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Petrobras's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Petrobras and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

97.    At all relevant times, the market for Petrobras's securities was an efficient market for the following reasons, among others:

(a)    Petrobras stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Petrobras filed periodic public reports with the SEC and/or the NYSE;

(c)    Petrobras regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Petrobras was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

98.    As a result of the foregoing, the market for Petrobras's securities promptly digested current information regarding Petrobras from all publicly available sources and reflected such information in Petrobras's stock price. Under these circumstances, all purchasers of Petrobras's securities during the Class Period suffered similar injury through their purchase of Petrobras's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

99.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Petrobras who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

100.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Petrobras's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

102.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Petrobras's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

103.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Petrobras's financial well-being and prospects, as specified herein.

104.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Petrobras's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Petrobras and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

105.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans,

projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

106.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Petrobras's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

107.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Petrobras's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information

that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Petrobras's securities during the Class Period at artificially high prices and were damaged thereby.

108.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Petrobras was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Petrobras securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

109.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

110.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: January 7, 2014/5

**GLANCY BINKOW & GOLDBERG LLP**

By: _Gregory Linkh_____

Gregory B. Linkh (GL0477)
glinkh@glancylaw.com
Brian P. Murray(BM9954)
bmurray@glancylaw.com
122 East 42nd Street, Suite 2920
New York, NY  10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160

*Attorneys for Plaintiff*

GLANCY BINKOW & GOLDBERG LLP

**SWORN CERTIFICATION OF PLAINTIFF**
**PETRÓLEO BRASILEIRO S.A. SECURITIES LITIGATION**

I, Louis Kennedy, certify that:

1.   I have reviewed the Complaint and authorized its filing.

2.   I did not purchase Petróleo Brasileiro S.A., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.   My transactions in Petróleo Brasileiro S.A. during the Class Period set forth in the Complaint are as follows:

     (See Attached Transactions)

5.   I have not served as a representative party on behalf of a class under this title during the last three years, except for the following: _____

6.   I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _12_ /_16_ _2014_                            _____
                                                                         Louis Kennedy

### Louis Kennedy's Transactions in
### Petróleo Brasil S.A. (PBR)

| Date | Transaction Type | Shares | Unit Price |
|------|------------------|--------|------------|
| 1/7/2010 | Buy | 5,000 | $48.4500 |
| 1/11/2010 | Buy | 5,000 | $48.6000 |
| 1/11/2010 | Buy | 5,000 | $48.4600 |
| 1/12/2010 | Buy | 5,000 | $47.1800 |
| 3/17/2010 | Buy | 5,000 | $46.9990 |
| 4/7/2010 | Buy | 5,000 | $45.7970 |
| 2/9/2012 | Buy | 5,000 | $32.0000 |
| 4/11/2012 | Buy | 5,000 | |
| 7/3/2012 | Buy | 5,000 | $19.2284 |
| 7/3/2012 | Buy | 5,000 | $19.2299 |
| 7/3/2012 | Buy | 5,000 | $19.4559 |
| 7/3/2012 | Buy | 5,000 | $19.4559 |
| 7/5/2012 | Buy | 10,000 | $19.7720 |
| 7/5/2012 | Buy | 5,000 | $19.6499 |
| 7/5/2012 | Buy | 5,000 | $19.6384 |
| 2/12/2013 | Sell | -5,000 | $15.9312 |
| 2/12/2013 | Sell | -5,000 | $15.8896 |
| 2/12/2013 | Sell | -5,000 | $15.8128 |
| 2/12/2013 | Sell | -5,000 | $15.8648 |
| 2/12/2013 | Sell | -10,000 | $15.8102 |
| 2/12/2013 | Sell | -5,000 | $15.8599 |
| 2/12/2013 | Sell | -5,000 | $15.9416 |